UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JERALD C. JAMES,

        Petitioner,

                               CASE NO. 2:09-CV-10929

     v.                         JUDGE AVERN COHN
                                  MAGISTRATE JUDGE PAUL J. KOMIVES

BLAINE C. LAFLER,

        Respondent.

————————————————/


**REPORT AND RECOMMENDATION**

*Table of Contents*

I.     RECOMMENDATION ....................................................... 2
II.    REPORT ................................................................ 2
    A.    *Procedural History* .............................................. 2
    B.    *Factual Background Underlying Petitioner's Conviction* ...................... 5
    C.    *Procedural Default* .............................................. 10
    D.    *Standard of Review* .............................................. 11
    E.    *Sufficiency of the Evidence (Claim II)* ................................... 13
          1.     *Clearly Established Law* .................................. 13
          2.     *Analysis* .............................................. 16
    F.    *Prosecutorial Misconduct (Claim V)* .................................. 17
          1.     *Clearly Established Law* .................................. 17
          2.     *Analysis* .............................................. 18
    G.    *Counsel Claims (Claims I & III)* ...................................... 21
          1.     *Failure to Substitute Counsel (Claim I)* ........................ 21
               a. Clearly Established Law ................................. 21
               b. Analysis .............................................. 24
          2.     *Ineffective Assistance of Counsel (Claim III)* ................... 27
               a. Clearly Established Law ................................. 28
               b. Analysis .............................................. 29
    H.    *Confession Claims (Evidentiary Hearing & Claim IV)* ...................... 33
          1.     *Evidentiary Hearing* ...................................... 34
          2.     *Involuntary Confession (Claim IV)* ......................... 36
               a. Clearly Established Law ................................. 36
               b. Analysis .............................................. 38
    I.    *Recommendation Regarding Certificate of Appealability* ...................... 40
          1.     *Legal Standard* ......................................... 40

                    2.      *Analysis*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
        J.      *Conclusion*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
III.        NOTICE TO PARTIES REGARDING OBJECTIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

                        *       *       *       *       *

I.        RECOMMENDATION: The Court should deny petitioner's application for the writ of

habeas corpus.  This Court should also deny petitioner a certificate of appealability.

II.        REPORT:

A.        *Procedural History*

        1.        Petitioner Jerald Connell James is a state prisoner, currently confined at the Carson

City Correctional Facility in Carson City, Michigan.

        2.        On May 10, 2006, petitioner was convicted of first-degree murder, MICH. COMP.

LAWS § 750.316(1)(a), second-degree murder, MICH. COMP. LAWS § 750.317, felon in possession

of a firearm, MICH. COMP. LAWS § 750.224f, and possession of a firearm during the commission of

a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Wayne County Circuit Court.

On May 24, 2006, the trial court sentenced petitioner as a third habitual offender, MICH. COMP.

LAWS § 769.10, to concurrent terms of life imprisonment without parole for the first-degree murder

conviction, 75-100 years' imprisonment for the second-degree murder conviction, and two to five

years' imprisonment for the felon-in-possession conviction, all consecutive to a two-year term of

imprisonment for the felony-firearm conviction.

        3.        On February 2, 2007, petitioner was resentenced as a second habitual offender to 65

1/2-100 years' imprisonment for the second-degree murder conviction, concurrent with his prior

sentences for conviction of first-degree murder and felon-in-possession.

        4.        Petitioner appealed as of right to the Michigan Court of Appeals raising, through

counsel, the following claims:

I. WHERE APPELLANT STATED THAT HE AND TRIAL COUNSEL COULD NOT GET ALONG AND THAT NEW COUNSEL SHOULD BE APPOINTED, HIS CONVICTION SHOULD BE REVERSED BECAUSE THE CIRCUIT JUDGE FAILED TO INQUIRE ADEQUATELY INTO THE BREAKDOWN IN THE RELATIONSHIP AND THE CONSTITUTIONAL RIGHT TO COUNSEL, AND ABUSED HIS DISCRETION IN NOT APPOINTING NEW COUNSEL.

II. DUE PROCESS REQUIRES VACATING APPELLANT'S FIRST-DEGREE MURDER CONVICTION WHERE THERE WAS INSUFFICIENT EVIDENCE OF PREMEDITATION.

Petitioner subsequently filed a supplemental *pro se* brief raising these additional claims:

I. INEFFECTIVE ASSISTANCE OF COUNSEL.

II. TRIAL TRANSCRIPTS WERE ALTERED.

III. APPELLANT'S FAMILY WERE DENIED ENTRY TO THE COURTROOM DURING CLOSING ARGUMENT, DEPRIVING APPELLANT OF HIS SIXTH AMENDMENT RIGHT TO A PUBLIC TRIAL.

IV. THE CONFESSION ADMITTED AT TRIAL WAS NOT GIVEN BY APPELLANT, BUT FABRICATED BY THE POLICE.

V. PROSECUTORIAL MISCONDUCT.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. James*, No. 271086, 2007 WL 3274843 (Mich. Ct. App. Nov. 6, 2007) (per curiam).

5. Petitioner, proceeding *pro se*, sought leave to appeal these seven issues to the Michigan Supreme Court. Petitioner also filed a motion to remand for an evidentiary hearing regarding his ineffective assistance claim. The Supreme Court denied both petitioner's application for leave to appeal and motion for remand in a standard order. *See People v. James*, 480 Mich. 1137, 746 N.W.2d 79 (2008).

6.    Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus

on March, 12, 2009.  As grounds for the writ of habeas corpus, he raises the following claims:

I.    PETITIONER STATES THAT HE AND TRIAL COUNSEL HAD A
CONFLICT OF INTEREST AND THAT NEW COUNSEL SHOULD BE
APPOINTED.  HIS CONVICTION SHOULD BE REVERSED BECAUSE
THE CIRCUIT JUDGE FAILED TO INQUIRE ADEQUATELY INTO THE
BREAKDOWN IN THE RELATIONSHIP . . . AND ABUSED HIS
DISCRETION IN NOT APPOINTING NEW COUNSEL.

II.    DUE PROCESS REQUIRES VACATING PETITIONER['S] FIRST
DEGREE MURDER CONVICTION WHERE THERE IS INSUFFICIENT
EVIDENCE OF PREMEDITATION.

III.    PETITIONER . . . WAS DENIED HIS STATE AND FEDERAL
CONSTITUTIONAL RIGHT TO THE ASSISTANCE OF COUNSEL,
WHERE HIS COUNSEL FAIL[ED] TO PRODUCE PHONE RECORDS,
FAIL[ED] TO CHALLENGE THE UNRELIABLE CONFESSION AND
FAIL[ED] TO OBJECT TO THE PROSECUTOR'S MISCONDUCT
DURING CLOSING ARGUMENTS.

IV.    PETITIONER WAS DENIED HIS FIFTH AMENDMENT RIGHT
AGAINST SELF-INCRIMINATION WHEN THE POLICE USED
ILLEGAL PROCEDURES TO FORCE A STATEMENT FROM
PETITIONER WHILE PETITIONER WAS UNDER EXTREME DURESS
[DUE TO] DRUGS[;] PETITIONER['S] REQUEST[ ] FOR AN
ATTORNEY WAS DENIED . . . WHICH RENDERED THE ALLEGED
CONFESSION INVOLUNTARY IN DIRECT VIOLATION OF DUE
PROCESS.

V.    PETITIONER WAS DENIED HIS STATE AND FEDERAL
FOURTEENTH AMENDMENT RIGHT OF DUE PROCESS TO A FAIR
TRIAL, WHEN THE PROSECUTOR ASSERTED FACTS THAT WERE
NEVER ADMITTED INTO EVIDENCE THAT [MISLED] THE JURY IN
A PREJUDICIAL WAY, AND WHEN THE PROSECUTOR STATED TO
THE JURY PETITIONER['S] TESTIMONY WAS A LIE AND DEFENSE
COUNSEL WAS RIDICULOUS WHICH [RESULTED IN] PREJUDICE
TO PETITIONER.

7.    Petitioner filed a motion for evidentiary hearing on May 15, 2009, concerning his

claim of involuntary confession.  This Court denied without prejudice petitioner's motion on the

grounds that the necessity for such a hearing was premature.

8. Respondent filed his answer on October, 27, 2009. He contends that petitioner's claims are either procedurally defaulted or without merit.

9. Petitioner filed a reply to respondent's answer on November 17, 2009.

10. Petitioner filed a second motion for evidentiary hearing on February 19, 2010, concerning his involuntary confession claim.

B. *Factual Background Underlying Petitioner's Conviction*

The factual background underlying petitioner's conviction was accurately summarized in the brief filed by petitioner's counsel in the Michigan Court of Appeals:

> Defendant-Appellant Jerald Connell James (hereinafter "Appellant") . . . was charged with two counts of first-degree premeditated murder in the deaths of Angela Jackson and Cheryl Parks, felon in possession of a firearm and felony firearm. Appellant was further notified, pursuant to MCL 769.13, that a prior felony conviction[] subjected him to sentencing enhancement as an habitual second offender. The events were alleged to have occurred on or about December 27, 2005 at King Richard and Kensington in the City of Detroit. On January 18, 2006, he appeared for preliminary examination.
>
> The parties stipulated that if Boguslaw Pietak were called as a witness, he would qualify as an expert in forensic pathology. Dr. Pietak would then testify that . . . Cheryl Parks died of three gunshot wounds, one being a contact gunshot wound that entered the left side of the head, and that the manner of death was homicide. Dr. Pietak would further testify that Angela Jackson [died of] multiple (three) gunshot wounds, and that her death was also determined to be homicide. The parties also stipulated to the identification of Parks and Jackson at the office of the Wayne County Medical Examiner, and that the Appellant had previously been convicted of an armed robbery on November 10, 1986, and that he had not regained his eligibility to possess a handgun.
>
> Detroit Police Officer Gregory Knapp then testified that at 3:00 a.m. December 27, 2005, he received a call regarding a person down at King Richard and Kensington in the City of Detroit. Arriving five minutes later, he observed a black female laying in the intersection in a pool of blood. She was breathing but unconscious. When EMS arrived, he noticed a gunshot wound in the cheek and notified homicide. He then preserved the evidence for technicians. He spoke with Deborah Simmons, who was there when he arrived.
>
> Detroit Police Officer Scott McKenzie stated that at about 2:45 a.m. he was

flagged down at King Richard and Kensington by a citizen, who directed him to a black female with a gunshot wound to the back of the head. He notified homicide and waited for them to arrive.

George Hamilton state that he had known Appellant over thirty years. On December 27, 2005, Appellant came to his house and requested money to clean his car. He had a broken passenger side window and what appeared to be blood on the door. Appellant stated that some people had attempted to rob him. Hamilton vacuumed the glass from the car and had the window replaced. After he was arrested, he made a statement implicating Appellant.

Detroit Police Officer Edie Croxton is the officer in charge of the Parks case. Appellant was arrested on December 28, 2005. On January 1, 2006, Croxton obtained a statement from him. According to Croxton, Appellant was advised of his constitutional rights and voluntarily reported that . . . on the evening of December 26, 2005, he picked up Parks and her daughter. They took her daughter to Parks' mother's house and proceeded to Parks' apartment on Whittier, where they drank beer and smoked crack before going to see Jackson, who lived on Wilfred. All three drank and smoked until about 2:00 a.m., before returning to Parks' apartment. Along the way, they argued. Parks went in briefly while Appellant and Jackson remained in the car. When Parks returned, the argument resumed. Appellant stated that he "lost it", shot Parks and kicked her out of the car. He drove a short distance before kicking Jackson from the car. He continued to drink and drive before discarding the gun in a dumpster. He drove to Hamilton's house. He and Hamilton vacuumed the glass at a car wash, left the car at a window replacement facility and resumed drinking.

Over counsel's objection as to the element of premeditation, Appellant was bound over to stand trial as charged. On May 3, 2006, he appeared for trial. Following preliminary matter, jury selection, preliminary instructions and opening statements, the following evidence was presented:

Bridget Parks stated that she is the sister of Cheryl Parks. She last saw Cheryl alive at 8:30 p.m., December 27, 2005, when Cheryl dropped off her daughter to spend the night. Bridget did not see who brought Cheryl, but did see her arrive in a brown Chevrolet Celebrity.

Rosalind Jackson stated that she is the sister of Angela Jackson. She last saw Angela on Christmas day. She had met Appellant and was aware that he was involved in a relationship with her sister. She knew him to drive a Chevrolet Celebrity.

Constance Appling stated that she lived in the area of Kensington and King Richard. At 2:45 or 3:00 a.m. December 27, 2005, she heard what sounded like gunfire and heard a neighbor scream. She looked outside of her window and saw a white car speed north on Kensington. She went outside to investigate and found that a person had been shot.

At 2:45 a.m. Detroit Police Officer Scott Kolesar and his partner, Gregory K[n]app, received a run to Kensington and King Richard where a person was lying in the street. They were the first officers to respond. The person was lying

unconscious but still breathing. A large amount of blood was protruding from a hole in the person's head. They observed broken glass and a trial of blood leading from the glass to the body. K[n]app made notifications. When homicide arrived, they stayed to assist. Speaking with possible witnesses led them to look for a white four door vehicle.

At 4:00 a.m., Detroit Police Officer Bratt Riccinto was flagged down by Jessica Raynard in the area of Hoyt and Lappin. She reported a dead female lying at the corner. The body had an apparent gunshot wound to the right side of her abdomen and a possible gunshot wound to the back of her head. He made notifications and spoke with Mr. Murph, who stated that she heard what she believed to be two gunshots and saw a dark or grey model older vehicle leave the location. Riccinto preserved that scene for [h]omicide investigators.

At 4:15 a.m. Detroit Police Officer Scott McKenzie and his partner were directed to Hoyt and Lappin by a citizen. A deceased female was lying in the street near the curb. After medics arrived they remained to secure the scene.

Dr. Boguslaw Pietak was qualified as an expert in forensic pathology. He stated that on December 27, 2005 he performed autopsies on both Cheryl Parks and Angela Jackson. As to Parks, he found three separate gunshot wounds to the head: a contact wound to the left side of the face with an exit on the right lateral side of the face; a penetrating wound to the left side of the scalp; and a penetrating wound to the back of the head. The two penetrating wounds showed no evidence of a close range firing. Bullets associate[d] with those wounds were recovered. As to Jackson, he also found three gunshot wounds: a penetrating wound to the left side of the head with no evidence of close range firing; one to the left back of the hand which did contain evidence of close range firing; and a penetrating gunshot wound to the right hip. He surmised that the hand wound may have been incurred by using it as a defense mechanism to shield the head or face. A bullet was recovered from the head. As to both Parks and Jackson, toxicology testing was positive for cocaine. In each case, Dr. Pietak found that cocain ingestion took place within an hour of death; that death occurred anywhere from minutes to an hour after the wounds were sustained; that the cause of death was multiple gunshot wounds and that the manner was homicide.

George Hamilton stated that he had known Appellant for thirty-six years. At 10:00 a.m. December 27, 2005, Appellant came to his house in a brown four door Chevrolet. The front passenger window was broken and covered with plastic. Appellant stated that some people had attempted to rob him and asked Hamilton to help him clean out the car. They went to a gas station to vacuum the glass before taking the car to a glass shop to have the window repaired. Hamilton recalled seeing only small spots of possible blood in the car.

Detroit Police Officer Irvan Higgins stated that he received information about Appellant and a brown Chevrolet Celebrity. He set up surveillance on the vehicle. After about 30 minutes, Appellant and Hamilton approached the vehicle. He arrested Appellant. When searched incident to arrest, Appellant was unarmed.

Detroit Police Officer Errol King is an evidence technician. At 6:20 a.m.

December 27, 2005, he responded to King Richard and Kensington. He photographed and prepared a sketch of the scene and recovered a jacket covered with suspected blood, two cups, a box of cigarettes and an extinguished cigarette butt. There was some broken glass west of the area.

Thomas K[e]ith Jackson stated that Angela Jackson was his mother. He identified her at the Wayne County Morgue. According to Jackson, Appellant drove a brown Celebrity.

Detroit Police Officer William Niarhos is an evidence technician. On December 28, 2005 he processed a brown Celebrity at Gene's Towing. Niarhos photographed the car and searched for blood and broken glass. He collected a steering wheel cover and a pair of gloves from the right front floor and various samples of suspected blood and performed a gunshot residue test on each quadrant of the interior, the head liner and door liners of the car. The evidence was turned over to the Detroit Police Crime lab for analysis. He reported that the right front floor and both sides of the rear floor were damp and the odor of bleach and cleaning solvents were detected.

Justin Jackson stated that Angela Jackson was his mother. He too recounted [Appellant] driving a brown Celebrity. He further stated that at 3:02 a.m., December 27, 2005 he received a call from his mother. She sounded normal.

Detroit Police Lieutenant Charles Flanagan stated that at 2:10 p.m. December 31, 2005 he interviewed Appellant. According to Flanagan Appellant, after first being advised of his constitutional rights, stated, as to Jackson, that he was drunk from alcohol and high on crack at the time, adding "I didn't want to hurt her. I lost my mind probably from alcohol and crack. Then I shot her. It was the devil." At 4:00 p.m. he again advised Appellant of his rights before discussing Parks. As to her, Appellant allegedly stated that she and Jackson were arguing when "I just snapped and shot her." Flanagan did not first conduct any sobriety testing.

Hayden Dannug is a forensic chemist employed by the Detroit Police Department. He was qualified as an expert in that field. Dannug stated that he performed initial examination and testing of various samples of suspected blood recovered from the vehicle by evidence technicians. Those which contained blood he gave to Glen Hall from the Crime Lab for DNA typing. He also examined the gunshot residue on the front bench seat, headrest and sun visors, but none on the rear seat. He examined rape kits from the women but found no sperm.

Glen Hall is a civilian employee of the Detroit Police Department working as the Forensic Laboratory Manager of trace evidence and forensic biology. He was qualified as an expert in forensic DNA analysis. Hall stated that he analyzed the samples provided to him by Dannug and compared then with known samples taken from Appellant, Jackson and Parks. According to Hall, three of the samples he examined could not exclude the DNA profile of Angela Jackson and six of the samples could not exclude the DNA profile of Cheryl Parks.

Harriett Murff stated that she lives at Hoyt and Lappin. At about 3:00 a.m. December 27, 2005, she heard some gunshots. Looking out of a window facing Lappin, she observed an older long dark car drive away.

Charlotte White stated that she lives at King Richard and Kensington. At 2:15 a.m. December 27, 2005, she was in the front of her house. From the rear of her house she heard two gunshots, two men talking back and a car speed off. She later saw an ambulance, several officers and a body lying in the street.

Detroit Police Sergeant Eddie Croxton is the officer in charge of the case. After speaking with family members of both decedents, he learned that both had a relationship with Appellant. After Appellant and Hamilton were arrested, he learned about the vehicle glass clean up and replacement from Hamilton. On January 1, 2006, Croxton obtained a statement from Appellant. According to Croxton, Appellant was advised of his constitutional rights and stated that on the evening of December 26, 2005, he picked up Parks and her daughter. They took her daughter to Parks' mother's house and proceeded to Parks' apartment on Whittier, where they drank beer and smoked crack before going to see Jackson, who lived on Wilfred. All three drank and smoked until about 2:00 a.m. before returning to Parks' apartment. Along the way, they argued. Parks went in briefly while Appellant and Jackson remained in the car. When Parks returned, the argument resumed. Appellant stated that he "lost it", shot Parks and kicked her out of the car. He drove a short distance before kicking Jackson from the car. He continued to drink and drive before discarding the gun in a dumpster. He drove to Hamilton's house. He and Hamilton vacuumed the glass at a car wash, left the car at a window replacement facility and resumed drinking. [Croxton] also obtained records from the glass company which repaired the car window and the motel where Appellant spent the night.

The People rested. Defense counsel's motion for directed verdict as to premeditated murder was heard and denied. After the remaining witnesses were waived, and various stipulations, including Appellant's prior conviction were entered, Appellant then testified that in December, 2005 he was living with Angela Jackson. Cheryl Parks was a friend with whom he was involved romantically. Jackson had spent Christmas with her family. On December 26, 2005 she called [asking] him [to] pick her up. On his way, he received a call from Parks, who also wanted a ride and to borrow money. He took Jackson home and proceeded to get Parks, who lived at Whittier and King Richard. After taking her to drop her daughter off with her mother, he returned Parks to her apartment and drove home and went to sleep. When he awoke the next morning, Jackson was gone and the window of his car was broken out. He denied shooting either woman, stating that he learned of their deaths from Jackson's son. He denied making either statement to the police, stating that the police gave him a meal which caused him to become ill, and they would periodically awake him to sign paper so that he could receive treatment. He could not account for Parks' blood in his car, but was aware that Jackson had begun her menstrual cycle in his car as he drove home.

The defense rested. Following a jury instruction conference, closing arguments and final jury instructions, Appellant was found guilty as charged of first degree murder in the death of Angela Jackson, guilty of the lesser included offense of second degree murder in the death of Cheryl Parks and guilty as charged of felon in possession of a firearm and felony firearm.

Def.-Appellant's Br. on Appeal, in *People v. James*, No. 271086 (Mich. Ct. App.), at 1-7 (internal citations omitted).

C.     *Procedural Default*

Respondent first contends that petitioner's claims of prosecutorial misconduct and his request for an evidentiary hearing are barred by petitioner's procedural default in the state courts, because petitioner's trial counsel both failed to object to the prosecutor's alleged misconduct and withdrew the motion for the evidentiary hearing. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

Even were the Court to conclude that some of petitioner's claims are procedurally defaulted, it would still be necessary to consider the claims on the merits. As noted above, petitioner can still have his defaulted claims reviewed on the merits if he can show cause for, and prejudice attributable

to, his default in the state courts. Petitioner contends that his trial counsel was ineffective for failing to object to the prosecutor's alleged misconduct and for withdrawing the motion for an evidentiary hearing. If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate that counsel was ineffective petitioner must show, *inter alia*, that his underlying confession claims would have succeeded. Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

D.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing

legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.      *Sufficiency of the Evidence (Claim II)*

Petitioner argues that the evidence was insufficient to sustain a verdict of first-degree murder. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution.  *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992).  In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence.  *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).  However, under the amended version of § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision.  Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).  Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment.  *See* MICH. COMP. LAWS § 750.317.  To establish second degree murder, the prosecution must show that the defendant killed a human being with malice aforethought.  In order to show malice aforethought, the prosecution must establish one of

three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). Certain additional elements elevate second degree murder to first degree murder, which is punishable by a mandatory term of nonparoleable life imprisonment. Specifically, under Michigan law, first degree murder includes any "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing." MICH. COMP. LAWS § 750.316(1). Thus, "[i]n order to convict a defendant of first-degree murder, the prosecution must prove that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate." *People v. Anderson*, 209 Mich. App. 527, 537, 531 N.W.2d 780, 786 (1995); *see also*, *Grant v. Rivers*, 920 F. Supp. 769, 786 (E.D. Mich. 1996); *People v. Younger*, 380 Mich. 678, 681, 158 N.W.2d 493, 495 (1968); *People v. Brown*, 137 Mich. App. 396, 407, 358 N.W.2d 592, 597 (1984).

Under Michigan law, "[p]remeditation is measured in time; time to permit a reasonable person to subject the nature of his response to a second look." *People v. Brown*, 137 Mich. App. 396, 407, 358 N.W.2d 592, 597 (1984). "The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing." *People v. Anderson*, 209 Mich. App. 527, 537, 531 N.W.2d 780, 786 (1995). Relevant factors include the relationship of the parties, the defendant's actions prior to the killing, the circumstances of the killing, and the defendant's conduct after the killing. *See id.*; *Brown*, 137 Mich. App. at 407, 358 N.W.2d at 597. Further, because first-degree murder requires premeditation and deliberation rather than simply malice

aforethought (as is required for second-degree murder), the actor must have the specific intent to kill in order to be convicted of first-degree murder. *See People v. Hart*, 437 Mich. 898, 898, 465 N.W.2d 328, 328 (1991); *People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 715 n.102, 299 N.W.2d 304, 320 n.120 (1980).

    2.    *Analysis*

Petitioner contends that the evidence presented at trial was insufficient to establish beyond a reasonable doubt that petitioner shot Jackson with premeditation and deliberation. Thus, the jury wrongly convicted petitioner of first-degree murder.

This claim is without merit. It is well established that both intent to kill and "premeditation and deliberation may be inferred from the circumstances surrounding the killing." *People v. Ortiz-Kehoe*, 237 Mich. App. 508, 520, 603 N.W.2d 809 (1999); *accord Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998); *People v. McRunels*, 237 Mich. App. 168, 181, 603 N.W.2d 95, 102 (1999). Here, Parks and Jackson were found approximately three miles apart. Trial Tr., dated May 8, 2006, at 185. A medical examiner testified that the types of wounds the victims sustained would have caused extensive bleeding. *See* Trial Tr., dated May 4, 2006, at 57, 61. Given the lack of blood evidence in petitioner's car and the distance between where Parks and Jackson were found, any reasonable finder of fact could infer that petitioner did not shoot Parks and Jackson in quick succession. Consequently, the evidence was sufficient for the jury to conclude that some measure of time occurred between the shootings, indicating that the second shooting was deliberate and premeditated. Thus, the evidence was sufficient to sustain the first-degree murder conviction.

Petitioner also argued in the state courts that the evidence was insufficient to establish that his murder of Jackson was willful, deliberate and premeditated. The Michigan Court of Appeals

rejected this claim, reasoning that the lack of substantial blood evidence in petitioner's car indicated Jackson was likely alive in the car after the shooting of Parks and before petitioner disposed of Jackson's body in a different location. *People v. James*, No. 271086, 2007 WL 3274843, at *4 (Mich. Ct. App. Nov. 6, 2007). Further, a witness testified that she heard gunshots at approximately 3:00 a.m. in the vicinity of where police found Jackson's body. *Id.* Police had discovered Parks's body approximately fifteen minutes prior to the witness hearing the gunshots. *Id.* Consequently, the circumstantial evidence was sufficient to create a reasonable inference that some time had elapsed between the shooting of Parks and Jackson, affording petitioner "the opportunity to reflect and take a 'second look[.]'" *Id.*.

The appeals court's conclusion was reasonable. Despite petitioner's contention that the evidence was insufficient to find that Jackson's murder was deliberate and premeditated, a rational trier of fact could have concluded that the lack of blood evidence in the car in conjunction with witness testimony was sufficient to establish beyond a reasonable doubt that petitioner acted deliberately and with premeditation. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his sufficiency of the evidence claim.

F.      *Prosecutorial Misconduct (Claim V)*

Petitioner makes several prosecutorial misconduct claims. Specifically, petitioner contends that the prosecutor misrepresented evidence, made statements that were factually unsupported, stated that petitioner lied, called petitioner's defense ridiculous, and stated that petitioner's defense strategy disparaged the victims. The court should conclude that these claims are without merit.

1.      *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough

that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

2.      *Analysis*

With respect to the claims that the prosecutor misrepresented evidence and made factually unsupported statements, the prosecutor was simply explaining her theory of the case based on the evidence and testimony. Specifically, petitioner drove around with Jackson for at least twenty minutes after shooting Parks. During this time, petitioner was contemplating if he should kill Jackson because she had just witnessed petitioner shoot Parks. Jackson was likely disturbed by what she had seen, so petitioner was probably trying to calm Jackson before deciding to kill her. In an effort to calm Jackson, petitioner let her call her son. Shortly after the end of the call, petitioner determined that he needed to eliminate the sole witness to Parks's murder, and shot Jackson.

The prosecutor reasonably developed this theory from the evidence. Petitioner gave

statements to the police, in which he confessed to shooting both Jackson and Parks in quick succession. Trial Tr., dated May 4, 2006, at 169. At trial, petitioner testified that he never confessed to the police and denied shooting the victims, despite conceding under cross-examination that his signature and initials were on the confessions. Trial Tr., dated May 8, 2006, at 163-66. A witness testified that at approximately 3:00 a.m. on the morning of the murders she heard gunshots in the vicinity of where police found Jackson. Trial Tr., dated May 8, 2006, at 41. Police were called to the location Parks was found approximately fifteen minutes earlier. Trial Tr., dated May 4, 2006, at 5-8. The medical examiner believed it unlikely that Jackson was in petitioner's car for a substantial length of time after petitioner shot her because the blood evidence in petitioner's vehicle, although existent, was minimal. Trial Tr., dated May 4, 2006, at 61. Jackson's son testified that his mother called him at 3:06 a.m. the day of the murders. Trial Tr., dated May 4, 2006, at 153-55.

The prosecutor's comments were merely a fair characterization of the evidence presented to the jury based on the prosecutor's summation of that evidence. Further, the prosecutor's comment that petitioner gave false testimony was a reasonable inference. Petitioner testified that he never gave statements to the police confessing to the murders, although he testified that the confessional statements bore his signature and initials. Petitioner's confession was further corroborated by police testimony and witnesses. As such, the prosecutor's comments were not improper. *See, e.g.*, *Nichols v. Scott*, 69 F.3d 1255, 1283 (5th Cir. 1995) (comment "is permissible to the extent that it draws a conclusion based solely on the evidence presented.") (internal quotation omitted); *United States v. Grey Bear*, 883 F.2d 1382, 1392 (8th Cir. 1989); *Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (prosecutor may argue permissible inferences from the evidence); *United States ex rel. Williams v. Washington*, 913 F. Supp. 1156, 1163 (N.D. Ill. 1995) (prosecutor's assertion during closing

argument that the defendant had "lied" did not deprive petitioner of a fair trial where "the prosecution's statements were reasonable inferences drawn from the physical evidence and witness testimony[.]").

With regards to the claim that the prosecutor prejudiced petitioner by stating that the defense was ridiculous and that the defense strategy entailed disparaging the victims, an important factor in judging the propriety of a prosecutor's comment is whether the comment was "invited by or was responsive to the [closing argument] of the defense." *Darden v. Wainwright*, 477 U.S. 168, 182 (1986); *see also*, *United States v. Young*, 470 U.S. 1, 12-13 (1985) (footnote omitted) ("If the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."); *United States v. Bond*, 22 F.3d 662, 667 (6th Cir. 1994). Here, the prosecutor's comments were merely a rebuttal to counsel's closing argument. Counsel argued that petitioner was a victim of a rush to judgment because the heightened media attention concerning the murders pressured the authorities to secure a conviction. Trial Tr., dated May 9, 2006, at 21. Further, counsel speculated that the victims may have been engaging in prostitution to support drug habits. Trial Tr., dated May 9, 2006, at 33-34. In this light, the prosecutor's remarks were not improper because they were simply a response to the defense's closing argument.

As the Sixth Circuit has noted, "[a] prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for truth." *United States v. August*, 984 F.2d 705, 715 (6th Cir. 1992). Thus, the prosecutor's comments that counsel's argument was "ridiculous" and that the defense characterized the victims as "prostitutes" and "drug addicts" did not deprive petitioner

of a fair trial. *See United States v. Catlett*, 97 F.3d 565, 572 (D.C. Cir. 1996) (prosecutor's comparison of defense counsel's attempts to divert jurors' attention from facts of case with pickpocket's diversion of his victim's attention was neither improper nor prejudicial); *United States v. Castro*, 89 F.3d 1443, 1457 (11th Cir. 1996) (no denial of due process where prosecutor stated: "These defense counsel, they represent their clients, they come in here and say what they want to help their clients."); *United States v. Emenogha*, 1 F.3d 473, 481 (7th Cir. 1993) (trial was not fundamentally unfair where prosecutor disparaged defense counsel by stating: "Now, Ms. Carotheres went on at length about the evidence the government presented where there were no tapes of this, no videotapes of that, no da da da da, da da da. Well, can you imagine if we left the investigation of this case to a criminal defense attorney what kind of evidence we would have?"); *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992) (defendant not denied a fair trial by prosecutor's description of the defense as "ridiculous."); *Lindgren v. Lane*, 925 F.2d 198, 204 (7th Cir. 1991) (prosecutor's comments that defense theory was rife with inconsistencies, that defense counsel pulled "these inconsistencies like a magician pulls rabbits out of his hats," and that defense counsel was trying to "trick" the jury with "illusions" were not so egregious as to warrant habeas relief).

In sum, the prosecutor's comments during closing argument did not misrepresent evidence nor were her comments improper. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these claims.

G.    *Counsel Claims (Claims I & III)*

Petitioner raises two counsel related claims. First, petitioner contends that he was constructively denied his right to effective assistance of counsel because the trial court denied his

request for substitute counsel. Second, petitioner argues that his counsel was ineffective for various reasons. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Failure to Substitute Counsel (Claim I)*

Petitioner contends that he and counsel had a conflict of interest, irreconcilable differences of opinion, and experienced a complete breakdown in communication. This deterioration in the attorney-client relationship was a result of several factors, such as petitioner's filing of a grievance complaint against defense counsel, disagreement over trial strategy, and counsel's failure to procure discoverable evidence and hearing transcripts. Petitioner argues that the trial court denied petitioner's request for substitute counsel failing to consider this deterioration in petitioner's relationship with counsel. Thus, he argues, the trial court constructively denied the petitioner's right to counsel.

*a. Clearly Established Law*

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. This right contemplates a corollary right to the counsel of one's choice, and thus a criminal defendant who has the desire and the financial means to retain his own counsel generally "'should be afforded a fair opportunity to secure counsel of his choice.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1351 (6th Cir. 1993) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)). However, "[a]lthough the Sixth Amendment contemplates a right to counsel of choice, that right is generally cognizable only to the extent defendant can retain counsel with private funds; an indigent defendant does not have an absolute right to choose appointed counsel." *Haynie v. Furlong*, No. 98-1177, 1999 WL 80144, at *1 (10th Cir. Feb. 17, 1999). As the Supreme Court has

explained, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). Further, the right to counsel of one's choice is not absolute, and "is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Importantly, the right to counsel of one's choice "must be balanced against the court's authority to control its own docket, and a court must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court." *United States v. Krzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988); *see also*, *Lockett v. Arn*, 740 F.2d 407, 413 (6th Cir. 1984) ("Although a criminal defendant is entitled to a reasonable opportunity to obtain counsel of his choice, the exercise of that right must be balanced against the court's authority to control its docket."). Further, as the Supreme Court has explained, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159. Thus, "in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'" *Id.* (quoting *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984). Because an indigent defendant has no absolute right to appointed counsel of his choice, and because the focus of the Sixth Amendment inquiry is on effective advocacy, "[a] criminal defendant who is dissatisfied with appointed counsel must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991); *accord United States v. Blaze*, 143 F.3d 585, 593 (10th Cir. 1998); *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990).

*b. Analysis*

Petitioner's substitution of counsel claim is without merit. With respect to the assertion that petitioner's grievance complaint caused a conflict of interest, petitioner cannot show that counsel was acting under an actual conflict of interest. Notwithstanding the allegation in the grievance that counsel was ineffective, counsel was not "required to make a choice advancing his own interests to the detriment of his client's interests." *Stoia v. United States*, 22 F.3d 766, 770 (7th Cir. 1994). This is because the filing of the grievance alone did not require counsel to take a position in which he was required to contradict defendant or testify as to the workings of the attorney-client relationship.

Thus, this case is similar to *United States v. Burns*, 990 F.2d 1426 (4th Cir. 1993), in which the court held that a state bar grievance filed by the defendant against his attorney three days prior to trial did not create a conflict of interest. The court explained that counsel "could [not] have gleaned any advantage for himself in disciplinary proceedings before the state bar by failing to employ his best exertions on Burns's behalf at trial." *Burns*, 990 F.2d at 1438; *see also*, *United States v. Holman*, 314 F.3d 837, 845-46 (7th Cir. 2002); *cf. United States v. Leggett*, 81 F.3d 220, 227 (D.C. Cir. 1996) ("This argument ignores the logic that . . . an attorney fearing an ineffective assistance of counsel claim has an incentive to do his best, not the contrary."). Several state cases have employed similar reasoning in rejecting conflict of interest claims, as has an unpublished decision of the Sixth Circuit. *See Wilson v. Rogers*, No. 96-3086, 1997 WL 615767, at *3 (6th Cir. Oct. 3, 1997); *Malede v. United States*, 767 A.2d 267, 271 (D.C. 2001); *Mercer v. Commissioner of Correction*, 724 A.2d 1130, 1134 (Conn. Ct. App. 1999); *People v. Adams*, 553 N.E.2d 3, 5 (Ill. Ct. App. 1990); *Commonwealth v. DiBenedetto*, 693 N.E.2d 1007, 1014 (Mass. 1998). This reasoning is applicable here: counsel would have gleaned no advantage by not zealously

representing petitioner, and thus the record does not demonstrate an actual conflict.

With respect to petitioner's alleged disagreement with counsel concerning trial strategy, this is insufficient to constitute the type of complete breakdown justifying appointment of substitute counsel. *See United States v. Carillo*, 161 Fed. App'x 790, 793 (10th Cir. 2006); *cf. Morris v. Slappy*, 461 U.S. 1, 13-14 (1983) (there is no constitutional right to a "meaningful attorney-client relationship."). The record indicates that petitioner's differences with counsel were centered on trial strategy. These differences provided no basis for a substitution of counsel at such a late stage in the proceedings. *See United States v. Romero*, 27 Fed. Appx. 806, 807-08 (9th Cir. 2001); *United States v. Castro*, 908 F.2d 85, 88-89 (6th Cir. 1990); *Matsushita v. United States*, 842 F. Supp. 762, 763-64 (S.D.N.Y. 1994).

Regarding petitioner's assertion of a complete breakdown in communication between himself and counsel, it is true that counsel indicated on the day of trial that petitioner had refused to speak with him, suggesting a complete breakdown in communication. Trial Tr., dated May 3, 2006, at 4-19. Petitioner cites numerous cases to support his contention that the trial court constructively denied him his right to counsel. However, petitioner "has cited no Supreme Court case – and we are not aware of any – that stands for the proposition that the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts of interest, but with whom the defendant refuses to cooperate because of dislike or distrust." *Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc); *see also*, *United States v. Vasquez*, 560 F.3d 461, 467-68 (6th Cir. 2009). On the contrary, the courts have generally held that "[a] unilateral refusal by the defendant to communicate with counsel may justify denying a request to substitute counsel, for example, where the defendant's refusal is frivolous or manipulative, or arises out of general unreasonableness or manufactured

discontent." *United States v. Valerdi-Melgarejo*, 11 Fed. App'x 796, 797 (9th Cir. 2001) (internal quotation omitted); *see also*, *Romero v. Furlong*, 215 F.3d 1107, 1114 (10th Cir. 2003). Here, the breakdown in communication was caused by petitioner's refusal to cooperate with counsel. In these circumstances, petitioner cannot show that the Michigan Court of Appeals's determination that he failed to establish good cause for substitution of counsel was unreasonable.

Further, even assuming that the trial court erred by not granting petitioner's request for substitute counsel, petitioner's claim fails because any error was harmless. As noted above, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably by represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159. Thus, the courts that have considered the issue have concluded that "[u]nless [a defendant] can establish an ineffective assistance claim under *Strickland v. Washington* . . . any error in the [trial] court's disposition of [the defendant's] motion for appointment of substitute counsel is harmless." *United States v. Graham*, 91 F.3d 213, 217 (D.C. Cir. 1996) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)); *see also*, *United States v. Calderon*, 127 F.2d 1314, 1343 (11th Cir. 1997); *United States v. Zillges*, 978 F.2d 369, 372-73 (7th Cir. 1992); *Bowie v. Renico*, No. 00-10013, 2002 WL 31749162, at *11 (E.D. Mich. Nov. 6, 2002) (Lawson, J.); *Stephens v. Costello*, 55 F. Supp. 2d 163, 172 (W.D.N.Y. 1999). As the Supreme Court has explained, "those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). Because, as explained below, petitioner was not deprived of the effective assistance of counsel, he has "no cognizable complaint."

This conclusion is not altered by the Supreme Court's decision in *United States v. Gonzalez-*

*Lopez*, *supra*.   In that case, the Court held that a defendant who has been denied his Sixth Amendment right to counsel of his choice need not demonstrate that his actual trial attorney was defective, or that he was prejudiced by counsel's deficient performance.  *See Gonzalez-Lopez*, 548 U.S. at 146.  Further, the Court held that a denial of the right to counsel of one's choice is a structural error, and thus harmless error review does not apply to such a denial.  *See id.* at 150-51.

*Gonzalez-Lopez* is inapplicable here.  That case involved a defendant who had retained counsel to represent him but was denied the right to have his retained counsel appear on his behalf. Nothing in that decision purported to alter the rules applicable to an indigent defendant's right to appointed counsel of his choice.  On the contrary, the Court explicitly reaffirmed the *Wheat* and *Caplin & Drysdale* conclusions that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them."  *Id.* at 151 (citing *Caplin & Drysdale*, 491 U.S. at 624; *Wheat*, 486 U.S. at 159).  Thus, *Gonzales-Lopez* does not call into question the Court's prior observation that "those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."  *Caplin & Drysdale*, 491 U.S. at 624; *see Garcia v. Quarterman*, No. H-06-0504, 2006 WL 2413714, at *14 (S.D. Tex. Aug. 18, 2006) (habeas relief not warranted based on failure to substitute appointed counsel where appointed counsel was not ineffective, notwithstanding *Gonzalez-Lopez*).

In sum, petitioner fails to establish a conflict of interest between himself and his counsel; irreconcilable conflict; or a complete breakdown in communication.  Thus, the trial court did not err when it denied petitioner's motion for substitute counsel.  Accordingly, this Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.      *Ineffective Assistance of Counsel (Claim III)*

Petitioner raises several ineffective assistance of counsel claims.  Petitioner alleges that counsel was ineffective because counsel:  failed to obtain the phone records of Jackson and Parks; failed to introduce petitioner's medical records;  advised petitioner to say that he did not confess to the police and failed to challenge the inconsistencies in the confession; and failed to object to the prosecutor's alleged misconduct.

*a. Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Id*. at 687.  These two components are mixed  questions of law and fact.  *Id*. at 698.  Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id.* at 697.  If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  *Id.*

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.*  at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).  "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted).  "[T]he court should recognize that counsel

is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

### b. Analysis

With regards to counsel's alleged failure to seek the victims' phone records, petitioner contends that the phone records would show that petitioner called the victims' cell phones during the time frame of the murders, thus showing that petitioner was not with the victims when they were murdered. This claim is without merit. As noted above, petitioner bears the burden of showing counsel's alleged error was so egregious that petitioner was effectively denied the right to counsel protected by the Sixth Amendment. *See id.* at 698. In other words, petitioner must show that counsel was not acting as counsel when he decided not to introduce the victims' telephone records into evidence. Petitioner fails to make the requisite showing. He offers no evidence that counsel should have been on notice that the victims' phone records would have been favorable to petitioner. On the contrary, petitioner testified at trial that he was at home sleeping when the murders occurred. Trial Tr., dated May 8, 2006, at 133. As explained in *Strickland*, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691. Given petitioner's testimony, counsel acted reasonably when he did not introduce phone records, which may have established that petitioner was not, in fact, sleeping when the murders occurred.

Even if the Court concludes that counsel should have introduced the phone records into

evidence, petitioner fails to show he was prejudiced. Assuming that the phone records would show that petitioner had called the victims during the time of the murders, such evidence alone would not definitively prove that petitioner was not in the presence of the victims at the time of the murders. Considering the weight of evidence against petitioner, there is not a reasonable probability that the jury would have reached a different verdict had counsel introduced the phone records into evidence.

With regards to counsel not producing petitioner's medical records at trial, petitioner argues that these records would have established that he was ill and in need of medical attention when he gave his statements to the police, thus challenging whether the statements were voluntary. This argument fails for two reasons. First, petitioner's trial strategy was to assert that he never gave inculpatory statements to the police. Consequently, counsel did not need to establish that the petitioner made an involuntary confession because he was ill. On the contrary, the admission of the medical records would have gone to an issue irrelevant to petitioner's argument. Thus, counsel committed no error by not seeking admission of medical records, which would merely have bolstered an argument not made at trial. Second, petitioner does not establish he was prejudiced by the exclusion of the medical records from evidence. Petitioner claims that he was ill and in need of medical treatment when he gave his confessions. However, petitioner submits no affidavit from a medical expert to show how his medical records establish that he was in need of medical attention when he gave his statements to the police. He merely offers his medical records to this Court with a conclusory statement that he was sick. Further, Petitioner confessed on December 31, 2005 and January 1, 2006. However, the medical records range from January 12, 2006 to April 10, 2006. These records alone do not indicate that petitioner was in urgent need of medical attention when he confessed to the police, eleven to twelve days prior to when the records begin. Consequently,

petitioner fails to show how the admission of the medical records would have assisted his defense. Because the medical records would not have benefitted petitioner's defense, there is not a reasonable probability that the jury would have come to a different verdict had the records been admitted into evidence. Thus, even assuming counsel erred by not introducing the medical records into evidence, petitioner was not prejudiced by counsel's alleged omission.

With regards to the improper advice claim, petitioner contends that counsel advised him to testify that he did not confess to the police and that he merely signed blank sheets of paper. Petitioner asserts that counsel told him that this was counsel's trial strategy. This claim is without merit. On the contrary, counsel's motion for an evidentiary hearing concerning the admission of the confessions indicates that counsel's trial strategy was not as petitioner contends. Counsel's trial strategy was to keep the confessions from being admitted, if possible; however, counsel was obliged to withdraw the motion because petitioner intended to testify that he did not confess to the police. Trial. Tr., dated Mar. 10, at 3-5. Further, counsel did attempt to call the voluntariness of the confession into doubt, over the prosecutor's objection, when cross-examining the officer who took the confession. Trial Tr., dated May 4, 2006, at 187-90. Counsel's actions speak strongly against petitioner's allegation. More likely, petitioner adopted his own trial strategy, over counsel's advice, of denying he made any confession. As Justice Alito noted, "'[a] defendant should not be allowed to take a gambler's risk and complain only if the cards [fall] the wrong way.'" *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308, 2330 (2009) (Alito, J., concurring) (quoting *Osborne v. State*, 163 P.3d 973, 984 (Alaska Ct. App. 2007) (Osborne II) (Mannheimer, J., concurring)). In any event, petitioner offers no evidence to rebut the strong presumption that counsel's decisions were within the range of reasonable professional conduct.

Even assuming petitioner's claim is true, petitioner was not prejudiced. There is not a reasonable probability that the court would have found the confessions inadmissable if the court had held the evidentiary hearing. After giving his statements, petitioner verified them as true and signed them in the presence of witnesses. Further, the interviewing officers testified to the voluntariness of the confession. The only support for petitioner's position would have been petitioner's own allegations of police misconduct. Because petitioner's allegations were not supported by any other evidence, the court would have doubtlessly admitted the confessions into evidence. There is not a reasonable probability that the jury would have reached a different verdict when considering the same body of evidence. Thus, petitioner was not prejudiced by counsel's decision.

Petitioner next asserts that counsel was ineffective for failing to challenge the reliability of the confession on the grounds that the petitioner's account of the murders did not correspond with the physical evidence. Petitioner's argument fails. The only substantive inconsistency between petitioner's confession and the physical evidence concerns the time of Jackson's murder. As discussed in part E.2 *supra*, the circumstantial evidence indicates that Jackson was shot some time after Parks, although petitioner confessed that he shot Jackson and Parks in quick succession. "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1 (2003); *see also*, *Strickland*, 466 U.S. at 690. Indeed, the record shows counsel vigorously challenged the memories of witnesses and the DNA test results. Counsel also attempted to impeach Lt. Flanagan and cast doubt upon the voluntariness of petitioner's confessions. In this light, counsel's decision not to attack the inconsistency between petitioner's confessions and other evidence was a tactical decision. Furthermore, petitioner again presents no evidence to rebut the

strong presumption that counsel's tactical choice was withing the scope of reasonable professional assistance.

Further, petitioner wasn't prejudiced by counsel's alleged failure. The inconsistency between petitioner's account of the murders and the other evidence offered at trial is apparent to any reasonable factfinder. Consequently, there is not a reasonable probability that the jury would have come to a different verdict had counsel explicitly pointed out the inconsistency between the evidence and the confession. Thus, counsel's alleged omission did not prejudice petitioner.

With regards to petitioner's claim that counsel was deficient for failing to object to the prosecutor's misconduct; as discussed in part F.2 *supra*, the prosecutor did not commit misconduct at trial. Consequently, counsel's objection to the prosecutor's alleged misconduct would have been denied; thus, counsel was not ineffective for failing to make it. Further, given the totality of the evidence before the jury, there is not a reasonable probability that the jury would have rendered a different verdict had the court sustained counsel's objection to the prosecutor's alleged misconduct. Thus, petitioner was not prejudiced by counsel's alleged omission.

For the above reasons, counsel rendered reasonable professional assistance to petitioner without introducing the victims' phone records and petitioner's medical records. Further, counsel was not deficient when he did not object to the prosecutor's closing argument. Moreover, even if the Court concludes that counsel was deficient, petitioner was not prejudiced by any of counsel's alleged omissions. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his claim of ineffective assistance of counsel.

H.      *Confession Claims (Evidentiary Hearing & Claim IV)*

Petitioner contends that his confession was involuntary and that he is entitled to an

evidentiary hearing to further this claim. The Court should conclude that an evidentiary hearing is neither appropriate nor necessary to evaluate petitioner's involuntary confession claim, and that petitioner is not entitled to relief.

1.     *Evidentiary Hearing*

In addressing whether an evidentiary hearing is appropriate in a habeas corpus case, a court must consider two separate issues: (1) is an evidentiary hearing necessary under Rule 8 of the Rules Governing Section 2254 Proceedings in United States Courts, 28 U.S.C. foll. § 2254; and (2) whether a hearing is permitted under 28 U.S.C. § 2254(e)(2). Here, an evidentiary hearing is not permissible under § 2254(e)(2), which provides that "[i]f the applicant has failed to develop the factual basis of the a claim in State court proceedings, the court shall not hold an evidentiary hearing on a claim unless" one of two exceptions is met. 28 U.S.C. § 2254(e)(2). In *Michael Williams v. Taylor*, 529 U.S. 420 (2000),[1] the Court explained that Congress' use of the term "'failed to develop' implies some lack of diligence[.]" *Id.* at 430. Thus, "[u]nder the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432. Under Michigan law, to develop the factual basis of his involuntary confession claim petitioner was required to file a motion for a new trial and evidentiary hearing in the trial court or a motion to remand for that purpose in the court of appeals. *See People v. Ginther*, 390 Mich. 436, 443-44, 212 N.W.2d 922, 925 (1973); *People v. Gray*, 125 Mich. App. 482, 486, 336 N.W.2d 491, 493 (1983).

---

[1]This case should not be confused with the *Williams v. Taylor* case discussed in part D, *supra*, in which the Court explained the standard of review under § 2254(d). Although both cases bear the same caption and were decided on the same date, the petitioners differed in the two cases. For clarity, I refer to the case discussing § 2254(e)(2) by the petitioner's full name–"Michael Williams"–rather than just by "Williams" as is the ordinary citation convention. *See Watkins v. Miller*, 92 F. Supp. 2d 824, 828 n.1 (S.D. Ind. 2000) (taking same approach).

Here, neither the court of appeals materials submitted by petitioner nor the trial court docket sheet reflects the filing of a motion for an evidentiary hearing on any claim.[2] Petitioner's failure to comply with the relevant state procedural requirements renders his effort to develop the facts not diligent; thus, he is not entitled to an evidentiary hearing here. *See Robinson v. Polk*, 438 F.3d 350, 368, (4th Cir. 2006); *Smith v. Bowersox*, 311 F.3d 915, 921 (8th Cir. 2002).

Even assuming that an evidentiary hearing were permitted under § 2254(e)(2), such a hearing is unnecessary. As noted above, the only evidence petitioner offers to advance his claim that he is entitled to an evidentiary hearing is his medical records. He presents no affidavit from a medical expert to substantiate his allegation that the medical records demonstrate he was in urgent need of care when he gave his confession to the police. The habeas rules "do[ ] not ... authorize fishing expeditions. A habeas petitioner must make sufficiently specific allegations; conclusory allegations will not suffice to mandate either discovery or a hearing." *Harris v. Johnson*, 81 F.3d 535, 540 (5th Cir. 1996). Petitioner's "'bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring ... an evidentiary hearing.'" *Washington v. Renico,* 455 F.3d 722, 733 (6th Cir. 2006) (quoting *Stanford v. Parker*, 266 F.3d 422, 460 (6th Cir. 2001). Thus, petitioner fails to show that he is entitled to an evidentiary hearing.

In short, petitioner failed to comply with the state requirements for obtaining an evidentiary hearing. He thus did not diligently attempt to develop the factual basis of his claim in state court, and is not entitled to an evidentiary hearing here. Further, an evidentiary hearing is unnecessary because petitioner does not establish that an evidentiary hearing would advance his claim.

---

[2]Petitioner did file a motion to remand with the Michigan Supreme Court concerning an ineffective assistance of counsel claim. However, petitioner does not request that this Court conduct an evidentiary hearing on his instant ineffective assistance claim.

Accordingly, the Court should conclude that petitioner is not entitled to an evidentiary hearing.

2.    *Involuntary Confession (Claim IV)*

Petitioner contends that he was not afforded due process because several self-incriminating statements, which he gave to the police, were wrongfully admitted into evidence.  He argues that, although he admitted in the statements to the murder of the victims, the police coerced petitioner's confession, rendering it involuntary.  Petitioner alleges that his confessions were involuntary because: the confession occurred after three days of interrogation; the police denied petitioner's request that counsel be present during the questioning; petitioner was under the influence of drugs; the police gave petitioner food which made him ill; and the police denied petitioner medical treatment.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

*a. Clearly Established Law*

As the Supreme Court explained in *Jackson v. Denno*, 378 U.S. 368 (1964), "a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession." *Jackson*, 378 U.S. at 376.  "Determining whether a confession is 'voluntary' for due process purposes entails an examination into the 'totality of the circumstances' to determine whether the confession was procured by acceptable techniques that draw upon an essentially free and unconstrained choice or by unacceptable tactics that extract their results from an overborne will.  The critical line of distinction is between 'self-direction' and 'compulsion.'" *Cooper v. Scroggy*, 845 F.2d 1385, 1390 (6th Cir. 1988) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)); *accord Dickerson v. United States*, 530 U.S. 428, 434 (2000).  It is not enough that a defendant's will was "overborne" by some factor for which state officials are not responsible.  "Coercive police conduct is a necessary

prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession." *Carter v. Johnson*, 131 F.3d 452, 462 (5th Cir. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).  There is no bright line test for determining whether a confession is voluntary, nor is any one factor dispositive.  Rather, a court must "look[] to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case.  Relevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishments, such as the deprivation of food or sleep." *United States v. Mahan*, 190 F.3d 416, 422-23 (6th Cir. 1999) (internal quotation and citation omitted); *accord*, *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997); *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994).

    For purposes of habeas review, "the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a [legal] matter for independent federal determination." *Miller v. Fenton*, 474 U.S. 104, 112 (1985).  However, a state court's findings of historical fact are presumed by this Court to be correct unless rebutted by petitioner with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  *See generally*, *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963) (factual findings entitled to a presumption of correctness under the habeas statutes are those relating to "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators.") (internal quotation omitted).  Thus, "subsidiary factual questions, such as whether . . . in fact the police engaged in the intimidation tactics alleged by the defendant are entitled to the § 2254[(e)(1)] presumption." *Miller*, 474 U.S. at 112; *see also*, *id*. at 117.

*b. Analysis*

Petitioner confessed to the murders of Parks and Jackson in several statements. In the first statement, taken on December 31, 2005 at 2:10 p.m., Lt. Flanagan asked petitioner questions concerning his background and general health before commencing the interview. Petitioner told Lt. Flanagan that he had completed the eleventh grade and had received a GED. Petitioner also stated that he had eaten a sandwich a half hour prior. Lt. Flanagan testified that petitioner appeared in good physical condition during the interviews. He also testified that he explained to petitioner his constitutional rights itemized one through five on a notification of Constitutional Rights form. Trial Tr., dated May 4, 2006, at 160-64. Petitioner initialed next to each of his rights except next to the third numbered right, which stated his right to have an attorney present during questioning. Trial Tr., dated May 8, 2006, at 148. Petitioner signed below his listed rights attesting that he understood his rights, and had not been threatened or promised anything, and that he agreed to answer questions. Through a series of questions and answers, petitioner then confessed to the murder of Jackson. Petitioner initialed next to each answer. Lt. Flanagan recorded the statement in his own handwriting; however, petitioner himself wrote at the bottom of the confession "I'm sincerely sorry. I pray to God for forgiveness and help." Trial Tr., dated May 4, 2006, at 164-68. After the interview and in the presence of a witness, petitioner initialed next to his inculpatory answers; indicated that his confession was voluntarily given; and signed the confession. Trial Tr., dated May 4, 2006, at 194-95. The interviewing officer took a second statement at 4:00 p.m. in a manner similar to the first. He again informed petitioner of his constitutional rights. This time petitioner initialed next to all five itemized rights and signed attesting that he understood his rights. Petitioner also stated to the interviewing officer that he was in poor health because of narcotics use. Petitioner then

38

confessed to the murder of Parks during the interview.  As with the first confession, petitioner initialed next to every individual answer.  The interviewing officer again recorded the statement in his own handwriting; however, petitioner wrote in his own hand at the bottom of the confession, "I'm very sorry.  Hopefully God can help me."  Trial Tr., dated May 4, 2006, at 168-70.  As with the first statement, petitioner, with a witness present, initialed next to his answers, indicated that his statement was voluntary, and signed the confession.  Trial Tr., dated May 4, 2006, at 194-95.  At trial, petitioner testified that he never confessed to the murders, although he conceded on cross-examination that the initials and signatures on the confessions were his.  Trial Tr., dated May 8, 2006, at 163-66.  The only evidence of police misconduct is petitioner's unsubstantiated testimony that he repeatedly asked for an attorney while he was in custody, and that the police gave him something to eat, which made him ill.  Although petitioner offers his medical records to support his claim that his confession was involuntary, as discussed in parts G.2.b and H.1 *supra*, the medical records alone do not constitute the clear and convincing evidence necessary to rebut the presumption that the state court's finding of historical fact are correct.

Petitioner's claim is without merit.  Petitioner possesses a GED.  Petitioner's signatures and initials attest that he was informed of, and understood, his constitutional rights before giving his confessions, and that he had not been threatened or promised anything.  The petitioner appeared in good physical condition during the interviews.  After giving his statements, petitioner verified them as true and signed them in the presence of witnesses.  The only indication that petitioner's confession was anything but voluntary is petitioner's own trial testimony.  Considering the totality of the circumstances, the Court should conclude that petitioner's confession was voluntary.  Accordingly, this Court should conclude that petitioner is not entitled to habeas relief on his

involuntary confession claim.

I.    *Recommendation Regarding Certificate of Appealability*

    1.    *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C.

§ 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.      *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should conclude that petitioner is not entitled to a certificate of appealability. Petitioner fails to make an adequate showing that he confessed involuntarily and that an evidentiary hearing is necessary to further his claim; thus, it is not reasonable debateable that another court would resolve this issue differently. Furthermore, it is not reasonably debatable that a rational trier of fact could have found petitioner guilty beyond a reasonable doubt of first-degree murder based on the admitted evidence. Thus, the conclusion that the evidence was sufficient to sustain a guilty verdict is not reasonably debatable. Moreover, it is not reasonably debatable that defense counsel's alleged omissions did not constitute deficient performance and were not prejudicial to petitioner. Thus, the

conclusion that counsel was effective under the *Strickland* standard is not reasonably debatable. Nor is it reasonably debatable that the prosecutor did not commit misconduct. Finally, it is clear that the trial court did not err when it denied petitioner's request for substitute counsel; thus, the resolution of this claim is not reasonably debatable. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

J.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/Paul J. Komives
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE
Dated: 8/3/10

The undersigned certifies that a copy of the foregoing
order was served on the attorneys of record and  by
electronic means or U.S. Mail on August 3, 2010.

                        s/Eddrey Butts
                        Case Manager